FELIX B. VICKNAIR, JR., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Vicknair v. Commissioner
Docket Nos. 8768-78, 12701-79
United States Tax Court
T.C. Memo 1990-434; 1990 Tax Ct. Memo LEXIS 449; 60 T.C.M. (CCH) 517; T.C.M. (RIA) 90434; August 13, 1990, Filed *449 Decisions will be entered under Rule 155. Felix B. Vicknair, Jr., pro se. Mitchell I. Horowitz, for the respondent. JACOBS, Judge. JACOBS
MEMORANDUM FINDINGS *450 OF FACT AND OPINION In these consolidated cases, respondent determined deficiencies in and additions to petitioner's Federal income taxes as follows: Additions to Tax
Year
Deficiency
Section 6653(b) [1]
1975
$    49,520.00
$    24,760.00
1976
$   955,839.70
$   477,919.85
1977
$ 2,945,502.08
$ 1,472,751.04
On December 16, 1977, respondent made a jeopardy assessment against petitioner for 1975 and 1976; the jeopardy assessment was made two days after petitioner was arrested with 29,140 pounds of marijuana. The reasonableness of the jeopardy assessment was upheld in . On February 13, 1978, a notice of deficiency was mailed to petitioner for 1975 and 1976. On March 16, 1978, respondent made a second *451 jeopardy assessment against petitioner for 1975 and 1976 for deficiencies greater in amount than that determined in the December 16, 1977 jeopardy assessment. A second notice of deficiency for 1975 and 1976 was mailed to petitioner on April 26, 1978. Also, on March 16, 1978, a termination assessment of petitioner's 1977 income tax liability was made. A notice of deficiency for 1977 was mailed to petitioner on June 13, 1979. After concessions by respondent, the issues for decision are: (1) whether petitioner received unreported income in 1975 and 1976, as determined by respondent using the net worth method of income reconstruction; (2) whether petitioner received unreported income in 1977, as determined by respondent using the bank deposits and cash expenditures method of income reconstruction; and, if there were underpayments of tax for 1975, 1976, and/or 1977; (3) whether all or any part of such underpayments were due to fraud. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulations of facts and accompanying exhibits are incorporated herein by this reference. Petitioner resided in Hialeah, Florida, at the time he filed his petition. *452 After serving in the Coast Guard, petitioner moved to Florida, where from 1950 to 1970, he operated a paint and body shop. From 1970 to 1974, he was self-employed as an automobile repair estimator for insurance companies. For 1972 to 1977, he reported the following amounts of income: Year
Gross Income
Taxable Income
1972
$  6,000.00
$  2,327.50
1973
$  5,250.00
$    375.00
1974
$  9,951.68
$    350.08
1975
$ 12,063.00
Not Shown
1976
$ 31,800.00
$ 28,650.00
1977
$ 65,000.00
$ 56,700.00
Starting in 1975, petitioner began to make cash purchases of boats, automobiles, and real estate, all of which were titled in the names of other persons or a corporation, F.B.V. Corp., controlled by petitioner. (F.B.V. Corp. was incorporated in the State of Florida on June 4, 1976. Petitioner owned 97 percent of its stock; three of his sons owned the remaining 3 percent.) In January 1975, petitioner purchased a 38-foot Chris Craft Sea Skiff (the CAVU) for $ 9,000. In order to acquire the CAVU, he obtained a $ 5,000 bank loan; the balance of the purchase price came from a joint savings account which petitioner maintained with his girlfriend, Shelby *453 Martin. The United States Customs Service seized the CAVU on July 14, 1975, after agents observed marijuana being unloaded from it. In July 1975, petitioner purchased a 57-foot Chris Craft, named the Scallywag, for $ 65,000 in cash. The United States Coast Guard seized the Scallywag on September 22, 1975, after traces of marijuana were found on board. In August 1975, petitioner purchased a 28-foot Cigarette Production racing boat for $ 21,100 in cash; title to this boat was taken in his son Felix J.'s name. In April 1976, petitioner purchased a 66-foot sport fisherman boat, Sky Top II, for $ 166,000 in cash. A check from the office account of John Hurtak (Hurtak), one of petitioner's attorneys and a friend of petitioner's family, in the amount of $ 150,433 was used in connection with the purchase of the boat; a day or so prior to the date Hurtak issued the check from his office account, petitioner gave Hurtak $ 150,433 in cash, in $ 20 and $ 100 bills. (Hurtak had placed the money given to him by petitioner in a trust account for petitioner.) Petitioner used the name "Frank Varcia" on the purchase agreement; title to Sky Top II was eventually in the name of F.B.V. Corp. *454 Sometime during 1976, petitioner brought $ 495,000 in cash in a valise to Hurtak. Hurtak deposited the cash into an account at a Miami bank in the name of "GESU Conference Society of St. Vincent De Paul", of which Hurtak was the president. (Petitioner's father was also an officer of GESU and had signature authority over GESU's account.) Ten days after giving the cash to Hurtak, petitioner requested that the money be returned. Hurtak then wrote a check on the GESU account payable to Florida National Bank & Trust Co.; thereafter, Florida National Bank & Trust Co. issued its cashier's check for $ 495,000 to Admiralty Marshall in Nassau, Bahamas. A day later, Admiralty Marshall issued a bill of sale evidencing the sale of a 600-foot cargo ship, named Pyramid Viking, for $ 505,000 to F.B.V. Corp. In April 1976, petitioner executed a contract for the purchase of an $ 80,000 residence located at 1100 Bay Drive, North Miami Beach, Florida (Bay Drive property). Closing was held in May 1976; a warranty deed was issued conveying the Bay Drive property to F.B.V. Corp. Petitioner paid approximately $ 42,000 in cash at closing. Also in April 1976, petitioner entered into a contract for *455 the purchase of the Leisureville Plaza Shopping Center in Boynton Beach, Florida for $ 1,400,000. To pay for the property, petitioner gave Hurtak $ 544,695 in cash. The money was deposited in petitioner's trust account with Hurtak and later disbursed at closing. Title to the shopping center was taken in the name "Felix B. Vicknair, Trustee." In December 1977, the shopping center was transferred by warranty deed to "John J. Hurtak, Trustee." By quitclaim deed dated August 10, 1981, the shopping center was transferred to "Shelby D. Martin, Trustee." In June 1976, petitioner gave a $ 15,000 deposit towards the purchase of a $ 125,000 residence located at 13250 Biscayne Bay Drive, North Miami, Florida. He paid an additional $ 40,753 in cash at closing. F.B.V. Corp. took title to the house. Petitioner also paid $ 25,000 in cash for the personal property located in the house. In July 1976, petitioner purchased a second mortgage on the Friendly Fenway Motel, Miami Beach, Florida, from a business acquaintance. He paid $ 22,500 in cash. Sometime during 1976, the holder of the first mortgage on the motel instituted a foreclosure action. A public sale of the motel was conducted in *456 February 1977; petitioner was the highest bidder, paying $ 35,000 in cash. In August 1976, petitioner gave a $ 10,000 deposit toward the purchase of a $ 225,000 residence located at 9330 Balada Street, Coral Gables, Florida, together with its contents. He paid an additional $ 20,000 in September 1976. To complete the purchase, petitioner gave Hurtak $ 230,000 in cash which Hurtak deposited in petitioner's trust account. Thereafter, Hurtak wrote a $ 195,000 check on the trust account payable to Florida National Bank which, in turn, issued a $ 195,000 cashier's check made payable to the seller of the Balada Street property. At the closing, a warranty deed dated September 1, 1976, was executed which placed title to the property in the name of Alvaro Cabrera. In May 1975, petitioner purchased a new Dodge truck for $ 5,631.34 in cash; title to the truck was taken in the name of John Vicknair, one of petitioner's sons. In October 1975, petitioner purchased a 1972 Dodge Charger for $ 2,957; title to the car was first taken in the name of Felix, Corp. (a corporation which petitioner controlled) and then in the name of Robert Vicknair, another of petitioner's sons. In December 1975, *457 petitioner purchased a new Lincoln Continental for $ 11,090.59; title to the car was placed in the name of Shelby Martin. In February 1976, petitioner purchased a new Cadillac for $ 13,814; title to the car was placed in the name of petitioner's father. In March 1976, petitioner purchased a new Pontiac Grand Prix for $ 6,678; title to the car was placed in the names of Georgia Anderson and Paul E. Vicknair. (Paul E. Vicknair is petitioner's son; Georgia Anderson was Paul's girlfriend.) In November 1976, petitioner purchased a new Dodge Charger for $ 7,334; title to the car was placed in the names of Georgia Anderson and Paul E. Vicknair. (In March 1977, Georgia Anderson transferred her interest in the car to petitioner's son Felix.) On March 1977, petitioner transferred title to his 1974 Lincoln Continental in the name of Linda Stingi, one of petitioner's daughters. In early 1976, petitioner purchased a Piper Arrow airplane from Dennis R. Kasionowicz for $ 17,000 in cash. Mr. Kasionowicz gave petitioner a Bill of Sale, but it was never recorded with the Federal Aviation Administration. During the six month period from January 1 to June 30, 1977, the following deposits *458 and credits were made to F.B.V. Corp.'s checking account at Miami Lakes First State Bank: Date
Amount
How Deposited
01-11-77
$  25,858.01 currency and checks
01-11-77
1.00 credit memo
01-13-77
8,000.00 currency and checks
01-14-77
7,000.00 currency and checks
03-07-77
9,347.14 currency and checks
03-08-77
9,000.00 currency and checks
03-09-77
100,000.00 currency and checks
03-17-77
5,206.60 currency and checks
03-24-77
9,000.00 currency and checks
04-18-77
110,000.00 currency and checks
04-20-77
7,900.00 currency and checks
04-21-77
6,532.37 currency and checks
04-25-77
11,982.00 currency and checks
04-26-77
9,000.00 currency and checks
04-29-77
60,000.00 check
04-29-77
4,000.00 currency and checks
05-09-77
164,911.73 wire transfer
05-16-77
200,000.00 wire transfer
06-03-77
3,385.11 currency and checks
06-22-77
6,058.58 currency and checks
06-29-77
18,000.00 check
06-29-77
2,500.00 currency and checks
06-29-77
2,500.00 currency and checks
06-29-77
22,000.00 currency and checks
06-29-77
2,500.00 currency and checks
06-29-77
2,500.00 currency and checks
06-29-77
2,500.00 currency and checks
06-29-77
2,500.00 currency and checks
06-30-77
9,900.00 currency and checks
$ 822,082.54 *459 On its Federal corporate income tax return for the taxable year ended June 30, 1976, F.B.V. Corp. reported no gross receipts, and showed no assets other than a $ 500.00 capital contribution by its shareholders. In the early morning hours of December 14, 1977, petitioner and eleven others (including petitioner's sons, Felix, Robert, and Paul) were arrested by police at 9330 Balada Street, where the police seized 29,140 pounds of marijuana which was being unloaded from the boat, Sky Top II, to the Balada Street residence. The police also seized a briefcase which contained guns, a notebook, various papers, and $ 2,000 in cash. (For additional background information, see .) Subsequently, petitioner and the others were charged in a three count indictment with conspiracy to import and possess marijuana with intent to distribute, importation of marijuana, and possession with intent to distribute. On November 30, 1981, petitioner was convicted and sentenced to five years in prison and fined $ 20,000. Petitioner engaged attorney Joel Hirschhorn to represent him in connection with the charges brought in the indictment. *460 By warranty deed dated July 7, 1978, signed as "Felix B. Vicknair, Jr., sometimes known as Alvaro Cabrera", the Balada Street residence was conveyed to Hirschhorn's law firm as security for the payment of legal fees. On August 20, 1981, petitioner was indicted for willfully attempting to evade and defeat his Federal income taxes for 1975 and 1976 in violation of section 7201. After a jury trial, he was found guilty on both counts. On January 13, 1982, the United States District Court for the Southern District Court of Florida entered its judgment of conviction, which was affirmed per curiam by the United States Court of Appeals for the Eleventh Circuit on July 25, 1983. OPINION Issue 1. Unreported Income for 1975 and 1976
Using the net worth method for 1975 and 1976, respondent determined that petitioner failed to report substantial amounts of taxable income and that the resulting underpayments of tax were due to fraud, making petitioner liable for additions to tax under section 6653(b) for both years. A taxpayer is required to keep sufficient records to enable the Commissioner to determine his correct tax liability. Sec. 6001. In the absence of such records, the *461 Commissioner may prove the existence and the amount of a taxpayer's income by using any method that clearly reflects income. Sec. 446(b); .The net worth method is an acceptable method of proving income. .Respondent's determinations are presumptively correct, and petitioner has the burden of proving otherwise. Rule 142(a); . Under the net worth method, the Commissioner must establish with reasonable certainty an opening net worth and further establish either that a likely source of taxable income existed or that he conducted a reasonable investigation of leads to negate the existence of nontaxable sources of income furnished by the taxpayer. ; The fact that a taxpayer is able to show an error in respondent's net worth computation does not destroy the presumption of correctness, shift the burden of going forward with evidence to respondent, or invalidate the use of the net worth method. *462 , affg. in part, revg. in part a Memorandum Opinion of this Court; , affg. on this issue a Memorandum Opinion of this Court. In his notice of deficiency, respondent determined petitioner's net worth as of January 1, 1975 (the applicable date for petitioner's opening net worth) to be $ 37,118.83. On brief, respondent concedes that petitioner's opening net worth in 1975 is $ 52,223.36 (rather than $ 37,118.83). (The increased opening net worth is attributable to asset and liability information obtained by respondent from third parties which petitioner did not make available to respondent.) Petitioner failed to show that his net worth as of January 1, 1975 was greater than $ 52,223.36. Thus, we find that petitioner's net worth as of January 1, 1975, was $ 52,223.36. Petitioner's principal contention relates to the ownership of certain assets which respondent included in his net worth computation. Petitioner argues that he made investments in certain assets as a nominee of Alvaro Cabrera, who petitioner says provided the funds and *463 was the true owner of the assets. Specifically, petitioner claims that the purchases of the Pyramid Viking, the Leisureville Plaza Shopping Center and the 9330 Balada Street property were made with funds (totaling $ 1,375,000) provided by Alvaro Cabrera. He also claims that Alvaro Cabrera provided some funds toward the purchase of the 13250 Biscayne Bay property and Sky Top II. In describing the purchase of the three assets allegedly bought with funds provided by Alvaro Cabrera, petitioner described a modus operandi as to how Alvaro Cabrera would get the funds to him. He testified that Alvaro Cabrera would give the funds to a Dr. Otero, who would meet with petitioner in one of several hotels located in the Miami area. Dr. Otero, whose first name was not known, would be accompanied by several Spanish speaking men, while petitioner went alone. Dr. Otero would hand a valise to petitioner containing United States currency, predominantly one hundred dollar bills. Petitioner would not count the money in Dr. Otero's presence; rather, he would take it to his home where he would spend the next few days counting it. After he completed counting the cash, he would take it to Hurtak, who *464 would disburse the funds as instructed by petitioner. No documents were ever exchanged between petitioner and Dr. Otero to evidence the passing of the funds. We regard petitioner's story to be pure hokum. The only evidence presented by petitioner is his own self-serving testimony, which we find incredible. On the other hand, respondent presented convincing evidence to the contrary through the testimony of attorneys Hurtak, Hirschhorn, and Greenfield, each of whom represented petitioner at one time or another, and Special Agent Rudner. Their testimony shows that, if an Alvaro Cabrera ever in fact existed, he had nothing to do with the purchase of the properties in question. None of the attorneys ever met or talked with any individual who had been identified to them as Alvaro Cabrera. Given petitioner's vast legal problems beginning with his arrest in December 1977, it could be expected that Alvaro Cabrera, if he were the true owner of these properties, would have made his presence known and sought their recovery. No evidence of such contacts exists. Similarly, when petitioner was tried and convicted of criminal tax evasion, his sole defense was that Alvaro Cabrera gave him *465 the money. If Alvaro Cabrera was the investor described by petitioner, he probably would have appeared in defense of petitioner. No evidence exists of such an appearance. Likewise, no evidence exists that Dr. Otero, the alleged bagman, ever appeared in defense of petitioner. It is conceivable that Dr. Otero is a recent creation of the petitioner's imagination because the special agent, who was involved in the investigation of petitioner at least since 1978, had never heard of him. Further, we believe it not unlikely that petitioner created Dr. Otero after the jury (which had heard petitioner's tax evasion case and found him guilty) was not convinced that an Alvaro Cabrera existed. Petitioner's testimony is full of holes. The first asset he claims he bought with funds provided by Alvaro Cabrera is the 600-foot freighter, Pyramid Viking, which was purchased in 1976 for $ 505,000 from the Admiralty Marshall in the Bahamas. Petitioner gave the money necessary to purchase this ship to Hurtak, who deposited the funds in the bank account of GESU, of which Hurtak was the president. Hurtak claims he deposited the funds in the bank account of GESU because he thought he (Hurtak) would *466 be holding the money for some period of time. If anything happened to him, he wanted to be sure petitioner would have access to the funds in the account. And how would that be accomplished? -- Through petitioner's father, who was secretary of GESU and had signature authority over the account. Within ten days after giving the money to Hurtak, petitioner requested that Hurtak use the funds to buy a cashier's check made payable to the Admiralty Marshall in the Bahamas. The cashier's check for $ 495,000 was used to pay the balance toward the purchase of the freighter, title to which was taken in the name of F.B.V. Corp., petitioner's controlled corporation. According to petitioner, Pyramid Viking was purchased for use as scrap metal and was never used to generate income for the corporation. Eventually, the freighter was sold for $ 260,000, resulting in a loss of $ 245,000. And who received the tax benefit of this loss? -- Petitioner and his three sons, through F.B.V. Corp. Nowhere is there any indication that Alvaro Cabrera or any other person received the benefit of this sale, the proceeds from which were deposited in F.B.V. Corp.'s checking account. Not only does petitioner's *467 story conflict with the stipulated facts, but also there is no evidence, other than petitioner's own self-serving testimony, that Alvaro Cabrera had anything to do with the purchase or ownership of the Pyramid Viking. We thus conclude that respondent did not err in including the purchase price of this asset in the computation of the petitioner's net worth for 1976. Facts conflicting with petitioner's claims also exist with respect to the purchase and operation of the Leisureville Plaza Shopping Center and the purchase and use of the 9330 Balada Street property. Perhaps the most damaging testimony provided by Hurtak concerns the purchase and operation of the Leisureville Plaza Shopping Center. Petitioner claimed that Dr. Otero gave him all of the money at one time and that he then brought the cash to Hurtak at one time. Hurtak's trust ledger sheet shows that petitioner brought cash on 15 separate occasions over a 5-week period for this purchase. After the Leisureville Plaza Shopping Center was purchased, legal title was placed in the name of "Felix B. Vicknair, Trustee." There is not a scintilla of evidence that a written trust agreement ever existed, nor is there any evidence *468 that a person other than petitioner was the owner of the "trust." And, as Hurtak's testimony pointed out, real property titled in the name of a trustee, but containing no evidence of either the owner or beneficiaries of the trust, is deemed under Florida law to be both legally and beneficially owned by the named trustee, i.e., petitioner. On December 23, 1977, shortly after petitioner's arrest on the marijuana charges and within a week of the jeopardy assessments made by respondent, petitioner caused legal title to the Leisureville Plaza Shopping Center to be transferred to Hurtak, also as Trustee. Petitioner claims that, after this transfer, he had nothing more to do with the shopping center. Hurtak provided contrary testimony in at least three respects. First, even after this transfer, $ 100 weekly payments were made to petitioner's father for support. Second, Hurtak attempted to negotiate a sale of the shopping center to Mexican investors, only to have petitioner veto the sale. Third, petitioner's girlfriend, Shelby Martin, was hired by Hurtak at petitioner's insistence to manage the property. Subsequently, in August 1981, petitioner requested that Hurtak transfer legal title *469 to the Leisureville Plaza Shopping Center to Shelby Martin as Trustee. Hurtak's stewardship of the Leisureville Plaza Shopping Center is illuminating for another reason. During the more than five years in which he was associated with the shopping center as manager and then "Trustee", Hurtak never received any communication from anyone purporting to be either the owner or the beneficiary of the trust. The only contacts he had with respect to this property were with petitioner, his girlfriend, and petitioner's father. As to the 9330 Balada Street property, petitioner testified that he gave Hurtak the bulk of the money used to purchase this property. Again, petitioner claims to have given the money to Hurtak all at one time; whereas, Hurtak's trust ledger sheet shows that petitioner made seven trips to Hurtak over a 2-week period to bring money. Hurtak had no contact with anyone identified to him as Alvaro Cabrera, despite petitioner's statements to Hurtak that it was Alvaro Cabrera who was actually purchasing the property. Hurtak's only knowledge of Alvaro Cabrera was through information supplied by petitioner. When the purchase of this property was completed, legal title was *470 placed in the name of "Alvaro Cabrera" on petitioner's instructions. Petitioner asserts that the property was purchased by Alvaro Cabrera to be used as an investment, and not for petitioner's personal use. He testified that Alvaro Cabrera intended to sell the house at a profit, and petitioner would receive his fee from the profit. In the meantime, Alvaro Cabrera had no intention of leasing the property to generate income, and petitioner admitted that he, not Alvaro Cabrera, paid the annual real property taxes. As usual, no one other than petitioner had any firsthand knowledge of Alvaro Cabrera's alleged financial interest in the property. Petitioner signed the deposit receipt for the purchase of the 9330 Balada Street property as buyer, with no indication that he did so in any type of fiduciary capacity. On September 14, 1976, the same day of the closing, petitioner executed an assignment by which he purported to transfer to Alvaro Cabrera his right, title, and interest under the deposit receipt to the Balada Street property. No other corroborating documents exist to evidence Alvaro Cabrera's ownership; and petitioner's understanding with Alvaro Cabrera was never reduced to *471 writing. After the purchase of this property, members of petitioner's family resided there, including petitioner's sons Paul, Robert, and Felix. At various times, petitioner or his sons would dock either the Cigarette racing boat or Sky Top II in the canal behind the property. At no time was the inside of the house filled with furniture or other personal property except for the mattresses on which petitioner's sons would sleep. At the time of his arrest, petitioner told the police that the house could be beautiful if fixed up and furnished right. This description is hardly befitting a house supposedly being held for its resale value. Petitioner also admitted at the time of his arrest that the 9330 Balada Street property was used as a way-station in his marijuana smuggling operations. After his arrest, petitioner retained Joel Hirschhorn (Hirschhorn) to represent him and his sons in the marijuana trial. To secure his fee, Hirschhorn caused petitioner to execute a warranty deed to the 9330 Balada Street property which petitioner signed "Felix B. Vicknair, sometimes known as Alvaro Cabrera." Hirschhorn recorded this warranty deed in the Dade County, Florida, public records. *472 The property was later sold and the proceeds turned over to Hirschhorn in two checks. The first check was for the balance of the fee due Hirschhorn for representing petitioner and his sons. The second check was for the balance of the sales proceeds. Hirschhorn claims that he endorsed the second check payable only to Alvaro Cabrera and that he subsequently saw the check bearing a signature of the name Alvaro Cabrera as well as indications that the funds had been deposited into a Cayman Island bank. However, Hirschhorn never saw the person who wrote Alvaro Cabrera on the back of the check nor did he see who physically deposited the funds. All in all, throughout petitioner's travails, Alvaro Cabrera, like Harvey the rabbit, was much talked about but never seen or heard. He did not testify, leaving the only evidence of his alleged ownership interests in the various properties to petitioner's self-serving and uncorroborated testimony, which we do not accept. By the same token, Dr. Otero remains as mysterious as one of Ian Fleming's characters. In short, our core view of petitioner is that he is unworthy of belief. Petitioner has failed to meet his burden of proof that he did *473 not own the assets which respondent included in the net worth computation. We therefore sustain respondent's income reconstruction, as adjusted, for 1975 and 1976. Issue 2. Unreported Income for 1977
Respondent reconstructed petitioner's 1977 income using the bank deposits and cash expenditure method. In his notice of deficiency, respondent determined that $ 822,082.54 deposited in the bank account of F.B.V. Corp., petitioner's controlled corporation, constituted unreported income. Due to certain concessions by respondent, respondent now posits that $ 397,170.81 is taxable to petitioner. We find that petitioner had unreported income of $ 397,170.81. When petitioner was arrested in December 1977, the police found approximately 30,000 pounds of marijuana. Respondent determined that petitioner had unreported income of $ 3 million (30,000 pounds X $ 100 per pound). On brief, respondent concedes that because the actual marijuana seizure was 29,140 pounds, the amount of unreported income was $ 2,914,000. Petitioner asserts that the marijuana was not his and that he held it on consignment. However, he failed to identify the owner of the marijuana. Considering that petitioner *474 was arrested and subsequently convicted of marijuana possession with intent to distribute, we conclude that the marijuana belonged to petitioner. Although we attribute ownership of the 29,140 pounds of marijuana to petitioner, we believe an adjustment is required as to the amount of unreported income. Lieutenant Harold Hopkin of the Coral Gables Police Department testified that during 1977, marijuana was being purchased for $ 40 per pound. Therefore, we conclude that its value was $ 1,165,600 (29,140 pounds X $ 40 per pound) rather than $ 2,914,000. Thus, the amount of petitioner's unreported income for 1977 was $ 1,562,770.81 ($ 397,170.81 + $ 1,165,600). Issue 3. Fraud -- Section 6653(b) Additions to Tax
A taxpayer criminally convicted for income tax evasion under section 7201 is collaterally estopped from denying fraud for purposes of section 6653(b) in a civil tax case involving the same taxable years. ; , affd. . Thus, petitioner's conviction under section 7201 for 1975 and 1976 collaterally estops him *475 from denying civil fraud for those years. Under section 6653(b), respondent has the burden of proving fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b). To meet this burden, he must show that the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes. ; .However, respondent cannot satisfy his burden of proving fraudulent intent by relying solely on the failure of the taxpayer to discharge his burden of proving error in the determination of the deficiencies. . The existence of fraud is a question of fact to be resolved upon consideration of the entire record. , affd. without published opinion ; . Fraud is not presumed. ; *476 However, fraud may be proved by circumstantial evidence because direct proof of the taxpayer's intent is rarely available. The taxpayer's entire course of conduct may be examined to establish the requisite fraudulent intent. ; . The intent to conceal or mislead may be inferred from a pattern of conduct. See . A pattern of consistent underreporting of income, especially when accompanied by other circumstances showing an intent to conceal, justifies the inference of fraud. ; However, the mere failure to report income is not sufficient to establish fraud. .Fraud may not be found under "circumstances which at the most create only suspicion." ; . *477 Here, there are numerous badges of petitioner's fraud: (1) consistent underreporting of substantial amounts of income; (2) inadequate records; (3) concealment of assets; and (4) extensive dealings in cash. Petitioner knowingly and intentionally failed to report income from the sale of marijuana. Respondent proved fraud by clear and convincing evidence; petitioner therefore is liable for the section 6653(b) additions to tax for 1975, 1976, and 1977. To reflect the foregoing and concessions made by respondent, Decisions will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the years at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩